**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| IN RE: FUSION-IO, INC. SECURITIES LITIGATION ) ) ) ) ) ) _____ ) | Case No.: 13-CV-05368-LHK ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND |

In this securities class action, Defendants David Flynn, Dennis Wolf, Shane Robison ("Individual Defendants"), and Fusion-io, Inc. (collectively, "Defendants") move pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rules of Civil Procedure 12(b)(6), 8, and 9(b) to dismiss the Consolidated Class Action Complaint ("Complaint" or "Compl."). *See* ECF No. 58 ("Mot."). Lead Plaintiffs Donald Hunt and Steve Winebrenner, as well as Additional Plaintiffs Nick Micek and Eric Rubenstein (collectively, "Plaintiffs"), oppose the motion on behalf of the class. *See* ECF No. 59 ("Opp'n"). Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS Defendants' motion to dismiss with leave to amend, for the reasons stated below.

## I.   BACKGROUND

### A.   Factual Background

Defendant Fusion-io, Inc. ("Fusion") is a computer hardware and software system manufacturer headquartered in Salt Lake City, Utah, with significant operations in San Jose, California. Compl. ¶¶ 3, 18. The Individual Defendants were key Fusion executives during the

1

**United States District Court**
For the Northern District of California

period of time from October 25, 2012 to October 23, 2013 ("Class Period"). *Id.* ¶¶ 1, 19-21. David

Flynn ("Flynn") was a co-founder of Fusion, and served as its CEO, President, and Chairman of

the Board of Directors ("Board") until he resigned on May 7, 2013. *Id.* ¶ 19. Flynn was also a

member of Fusion's Board until June 14, 2013. *Id.* Dennis Wolf ("Wolf") was Fusion's CFO from

November 2009 until October 23, 2013. *Id.* ¶ 20. Wolf also served as Executive Vice President

from October 2010 until October 23, 2013. *Id.* Shane Robison ("Robison") became CEO,

President, and Chairman of the Board on May 7, 2013, the day Flynn resigned. *Id.* ¶ 21. Robison

was replaced as President on August 1, 2013, but retained his position of CEO and Chairman. *Id.*

Robison also served as a director of Fusion beginning in December 2011. *Id.*

Fusion designs and builds products that use flash memory technology, also referred to as

NAND flash memory. *Id.* ¶ 3. Flash memory is an electronic computer storage medium that can be

electrically erased and reprogrammed, and is used in smartphones, tablets, computers, and

datacenter servers. *Id.* ¶ 4. Flash memory offers advantages over traditional memory systems,

which rely on magnetic spinning disks, because flash memory makes applications faster, offers

more capacity while using less physical space, has no mechanical parts, generates less heat than

spinning disk storage, and requires less maintenance. *Id.* As a result of these traits, flash memory

also offers buyers and users a degree of cost savings. *Id.*

Plaintiffs allege that, before and during the Class Period, the flash memory industry was

experiencing a trend of commoditization. *See* Compl. ¶¶ 5-6. This was caused in part by the fact

that the designs of the most successful flash memory devices were relatively simple, and ongoing

innovation was increasing memory capacity and improving speeds. *Id.* ¶ 5. As a result, various

flash memory manufacturers lowered their prices and experienced declining profit margins. *Id.*

Also of particular relevance to the instant lawsuit, Plaintiffs further allege that Fusion relied on two

prominent customers—Facebook, Inc. ("Facebook") and Apple, Inc. ("Apple")—for a significant

portion of Fusion's revenues. *Id.* ¶ 7. In Fusion's fiscal year 2012, Facebook and Apple

respectively accounted for 30 percent and 25 percent of Fusion's revenue. *Id.* In Fusion's fiscal

year 2013, these percentages were 29 percent and 15 percent. *Id.*

2

Plaintiffs purchased Fusion common stock during the Class Period. *Id.* ¶¶ 14-17. The gravamen of Plaintiffs' allegations in this lawsuit is that the Individual Defendants made materially false and misleading public statements in Fusion's press releases, reports, and public filings, during earnings calls, and in other venues regarding Fusion's business outlook and the impact (or lack thereof) of industry trends on Fusion's bottom line. *See id.* ¶ 22. Plaintiffs contend that the Individual Defendants failed to disclose that Fusion was subject to the trend of commoditization that was otherwise affecting the flash memory industry, which in turn jeopardized Fusion's financial performance. *See, e.g.*, *id.* ¶ 38. Plaintiffs also claim that Fusion withheld from the investing public the fact that Facebook and Apple were becoming increasingly price sensitive with respect to new purchases of flash memory products, and that as a result Fusion was at risk of losing business from two of its major customers. *See, e.g.*, *id.* ¶ 39. In particular, on January 30, 2013, when Fusion announced results for its fiscal second quarter of 2013, the company lowered previously-announced revenue projections for the fiscal year, originally stated as between 45 to 50 percent growth in revenue, to a more modest projection of between 17 and 22 percent. *Id.* ¶ 43. Some of the Individual Defendants attributed the change to the fact that Facebook and Apple shifted the timing of bulk purchases of Fusion products to a later quarter. *See id.* ¶¶ 44-48. Plaintiffs contend these statements were false and misleading. *Id.* ¶ 49. This was because, according to Plaintiffs, the Individual Defendants knew that the decision of Facebook and Apple to not purchase Fusion products represented a possibly permanent decrease in demand from these two customers because of the price of Fusion's flash memory. *See id.*

In support of their allegations, Plaintiffs rely on Fusion's public filings with the U.S. Securities and Exchange Commission ("SEC"); Fusion's quarterly earnings calls; other publicly available information such as financial analyst reports; and interviews with former Fusion employees, identified by Plaintiffs as "Confidential Witnesses" ("CW"), who worked at Fusion during at least part of the Class Period. *See id.* ¶¶ 41, 102-09. These witnesses offer a range of perspectives on Fusion's internal operations, and although the Court will discuss each CW's statement in detail at a later point, a broad overview of their statements is pertinent here. One witness, identified as CW1, claimed that he was told after Fusion reaffirmed its higher guidance for

3

fiscal year 2013 that Fusion would not make its projected revenues and had to eliminate jobs to enhance profitability. *Id*. ¶ 41. Other confidential witnesses, identified as CW2, CW3, CW4, and CW8, reported that Fusion faced competition from other manufacturers of flash memory, at least some of whom priced their products lower than Fusion. *Id*. ¶¶ 103-05, 109. Two confidential witnesses, identified as CW5 and CW6, stated that they believed Fusion's sales to Apple declined because of competition, and because the mass-production and commoditization of flash memory made the price of flash memory cheaper. *Id*. ¶¶ 106-07.

Plaintiffs allege the Individual Defendants made a total of thirty-one false and/or misleading statements or omissions in press releases, SEC filings, earnings calls, and public remarks at conferences or on webcasts. The Court has organized these statements chronologically and by source. Where necessary to the Court's discussion below, the Court has provided the context for the statement at issue and indicated the challenged statement itself in bold font.

### August 9, 2012 Press Release
**Statement 1**
"[W]e are pleased with the ***momentum we have going into the next fiscal year***. . . . We believe we are still in the early stages of demonstrating the transformative potential of software defined storage solutions that deliver greater performance and efficiency for customers at a fraction of the cost of legacy systems."

### August 9, 2012 Analyst Call
**Statement 2**
"With regard to our revenue mix for the fiscal year, revenue from our 2 largest customers combined grew 66% year-over-year and represented 55% of our total business. As it relates to our core customer revenue, we saw it more than doubled this year as we continued to build out our sales team and expand our go-to-market strategy. ***We expect these trends to continue to be catalysts for robust growth*** . . ."

**Statement 3**
"The combination of our go[-]to-market strengths and our expanding product portfolio is just now beginning to pay off."

**Statement 4**
"[W]e made excellent progress this year on our product road map, go-to-market strategy and market share capture . . ."

### September 25, 2012 Letter Accompanying Annual Report
**Statement 5**
"We use Flash as a new type of server memory, adapted for enterprise use where data reliability is even more critical, while others in the industry chose to integrate

*United States District Court*
*For the Northern District of California*

Flash like a disk drive. We knew the latter approach would limit this powerful new medium and keep it from achieving its full potential. We believe this gives us a strong head start and competitive advantage.

. . . We are still in the early stages of this data center transformation, and we believe our strong execution this past year demonstrates that we are well positioned to continue to drive it.

In fiscal 2012, we achieved significant milestones in financial growth and product innovation. Our business momentum is best highlighted against the goals we established at the beginning of this past year: capture market share; enhance our product portfolio; and expand our go-to-market strategy.

We delivered 82% revenue growth during the last fiscal year, significantly outperforming the industry and solidifying our leadership position. We attribute this to the compelling return on investment our solutions provide to end-user customers as well as our differentiation in technology and sales strategy. . . .

We believe the enhancements we made to our product portfolio during the last year reflect our steady focus on innovation and lay the groundwork for continued market leadership."

**October 24, 2012 Press Release**
　　　Statement 6
　　　"We are pleased with our execution in the first quarter and *our ability to continue to capture market share*."

**October 24, 2012 Earnings Call**
　　　Statement 7
　　　"We continue to believe, we have a *compelling opportunity in this market environment, given that our products generate a significant return on investment for our customers*."

**November 7, 2012 Form 10-Q**
　　　Statement 8
　　　Defendants Flynn and Wolf's signed certifications on Fusion's fiscal first quarter 2013 report. Plaintiffs allege the Form 10-Q was false and misleading because it failed to disclose, pursuant to Item 303 of Regulation S-K, that Fusion "was facing increasing competition due, among other things, to the commoditization of flash memory, which put downward pressure on prices and gross margins, which jeopardized the Company's financial performance and prospects."

**January 30, 2013 Press Release**
　　　Statement 9
　　　"Our two largest customers have purchased nearly half a billion from Fusion-io since 2010, representing robust adoption of our technology. There is a lot of potential with these key customers, and *the change in our guidance reflects a two-quarter shift in the timing of their bulk purchases*. A healthy pipeline for growth, fueled by new products and partnerships, as well as a sol[i]d financial position . . . will enable us to drive the business forward and create value for our shareholders."

Case No.: 13-CV-05368-LHK
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

**Statement 10**

"The shift to the cloud from traditional IT, and the shift away from mechanical storage to solid state, are twin catalysts to our business. ***We are well-positioned to capture opportunities*** as a growing number of customers decide to migrate away from legacy storage and move to the cloud using new memory architectures."

### January 30, 2013 Earnings Call

**Statement 11**

"Let me address what is certainly top of mind [sic], our guidance for the second half of the year. Our core enterprise business grew at 67% year over year in the second quarter, and our guidance reflects that strong growth. ***The change in our guidance is the result of a shift in the timing of bulk purchases from our two key accounts, specifically for the next two quarters***."

**Statement 12**

"When building out data centers and expanding into new application areas, these customers have purchased in large volumes. They are now achieving greater efficiency thanks to our products, which has led to ***a shift in their near term demands***. At the same time, they are finding new applications, services, and data tiers in which to leverage our products.

While our guidance reflects a cautious outlook in the balance between these two conflicting forces, over the past seven quarters, their orders have frequently exceeded our expectations, as they often move more quickly in developing new ways to add additional value using our solutions.

Our key accounts are managing an exponential increase in data, ***while simultaneously managing their bottom line***. These divergent business demands cause lumpy buying patterns that are indicative of a market going through a radical transformation. This transformation is made possible by new memory architectures that are driving an unprecedented increase in capability and efficiency.

Fusion-io is at the forefront of this transformation. . . .

In summary, we are pleased with our strong performance in the quarter, and are excited to continue to lead an industry going through a radical transformation. The sheer scale of this transformation, as customers move wholesale to all-Flash architectures can lead to lumpiness in our revenue quarter to quarter as customers learn to extract the full potential of Flash to drive efficiency in their infrastructure."

**Statement 13**

"Now turning to guidance, we expect our core enterprise business to continue to grow in excess of 50% for the full year. Our change in guidance is, as we have said, ***a result of a shift in the timing of bulk purchases***, and so therefore, for the fiscal third quarter of 2013, we expect revenue to be approximately $80 million."

Case No.: 13-CV-05368-LHK
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

**Statement 14**

"We do also believe that *the strategic accounts are a two-quarter shift*. We don't see this as a permanent dysfunction, if you will. *It's just a shift in what we expect the demand to be there*. We're not giving guidance yet on 2014, but *nothing has really changed*."

**Statement 15**

"We work with these customers very closely, and have an understanding of what new applications are coming online and how they're scaling them. So this is based on information with our interaction with those teams, and the fact that never has really the use of our product been the question. *It's the question of when their deployments happen. So this is really about the timing of when they put in new infrastructure, not whether or not Fusion-io is a key part of that infrastructure*."

**Statement 16**

"*We don't see any risk at this point from competition in these accounts, and these architectures*. It's a major investment. As you heard Jeff Rothschild, at the event, say, that the partnership with Fusion-io is a major investment. They have not made that investment with other folks at this point.

*So we don't see a risk from the competition from that point of view. The real question comes into play is when do they make these investments in the infrastructure*."

**Statement 17**

"Here's the interesting thing, as we've worked with these customers, *it's rather ironic that the efficiencies attained through leveraging their own products is what allows them to extend the efficiency, allows them to extend the timeframe, for which they need to put in more equipment*. So as they balance their business between investing to extend capability versus driving efficiency to reduce expenses, it's just rather ironic that the product is kind of our own competition. And that has extended that time period.

*. . . we're very confident that the uniqueness of our product, and more importantly the relationship with these customers, means that when they decide to do their next step function in building new data centers or moving to new apps, that it will be with Fusion-io*."

**February 9, 2013 Form 10-Q**

**Statement 18**

Defendants Flynn and Wolf's signed certifications on Fusion's fiscal second quarter 2013 report. Plaintiffs allege the Form 10-Q was false and misleading because it failed to disclose, pursuant to Item 303 of Regulation S-K, that Fusion "was facing increasing competition due, among other things, to the commoditization of flash memory, which put downward pressure on prices and gross margins, which jeopardized the Company's financial performance and prospects."

United States District Court
For the Northern District of California

**February 11, 2013 Remarks at Barclays Second Annual Big Data Conference**

**Statement 19**

"You can see a nice, steady growth in our base business. The business with Apple and Facebook is based on their deployment schedules. We, as a strategic partner, we ship when they need the stuff to ship, and it depends on when they're building new data centers, when they're building new applications. There is run rate in that they're continually growing their user space. . . . And then there is the stepfunctions, big bulk purchases when the new data center goes in or when they bring a new application live. Now we currently don't have visibility in the next 2 quarters for them doing much more than their current run rate business. . . . ***I think this time, they are being a little more capital-conscious trying to stretch the dollar***. There's only so far you can stretch it before you need to build an infrastructure. So for example, with Facebook . . . We had anticipated them to refresh the data center and to put in new application area. But instead, they realized they didn't—they don't— the data centers they have, this 4-year old one, doesn't need to be refreshed and they reused product to start seeding their new application, the Graph Search. So it's kind of a double-edged sword. . . . [T]he fact that our product lasted more than 4 years, they're able to reuse it in a new application area. ***So that's just in the next 2 quarters***."

**Remarks at February 12, 2013 Goldman Sachs Technology and Internet Conference**

**Statement 20**

"I don't want to tick off Apple by going into them too much. So let me tell you what's going on behind the scenes at Facebook. We have now done 4 data centers with them over the period of 4 years. . . . And that first data center, kind of up for a refresh or decommission. They decided to decommission it instead of refresh it. . . . Secondly, we had expected some new application areas. Indeed, new applications did come. The Graph Search uses flash, uses Fusion-io. It just happens to use for the first couple of pods our 4-year old product from the data center that got decommissioned, displacing and putting a revenue pocket because of the use of that. . . . They already had the Fusion-io. And it proves the point that our product is -- has a second life and is valuable. . . . So that's really kind of where the air pocket comes in from Facebook side. The truth is that both of those customers, they're [sic] buying patterns oscillate. . . . And so those 2 quarters up, 2 quarters, down, you kind of see that oscillation. . . . ***But based on our own expectations, it's going to be both of them are at a low for the next couple of quarters***."

**Remarks at February 27, 2013 Morgan Stanley Technology, Media & Telecom Conference**

**Statement 21**

"What happened though in the process is that during the last—at least in the last quarter, we found that the first data center that we built was being repurposed for a different tiering level, which we are in. We won, obviously, because they were able to take some of our older product and put it there. ***And so what we expect is kind of a timing thing***. What we expect is for that tier, it should probably start to move up within the next couple of quarters, and then there's that data center that we expect as

well. So we would anticipate that our 10% to 20% sustainable run rate will go up from there."

**April 24, 2013 Press Release**

**Statement 22**
"We are pleased by our traction this quarter, driven by strength in our core business as well as our healthy pipeline of new hyperscale customers."

**Statement 23**
"Our ioScale product is showing notable traction as customers supporting cloud and Big Data applications appreciate our software systems capabilities that offer them a very compelling ROI on their datacenter infrastructure spend."

**April 24, 2013 Earnings Call**

**Statement 24**
"Our relationship with Facebook and Apple is strong. Their orders this quarter were in line with our expectations. They are a key -- we are a key part of their infrastructure and expect to grow as they grow."

**May 7, 2013 Form 10-Q**

**Statement 25**
Defendants Flynn and Wolf's signed certifications on Fusion's fiscal third quarter 2013 report. Plaintiffs allege the Form 10-Q was false and misleading because it failed to disclose, pursuant to Item 303 of Regulation S-K, that Fusion "was facing increasing competition due, among other things, to the commoditization of flash memory, which put downward pressure on prices and gross margins, which jeopardized the Company's financial performance and prospects."

**Remarks During May 9, 2013 Webcast**

**Statement 26**
"They've done a marvelous job of taking the company from startup through the IPO and **_to a successful public company_**. And now, our challenge is how do we really grow the company to the next level? . . . And it's not that unusual for startup companies to evolve to medium-sized companies, and then you need a different management skill set. . . . **_[T]here's not a problem with the company_**."

**August 7, 2013 Press Release**

**Statement 27**
"Fusion-io pioneered the all flash data center architecture that the industry is now embracing, and **_we are well positioned to capture a significant share of the opportunity from enterprise to hyperscale over the next few years_**."

**Statement 28**
"We exited fiscal 2013 with a significantly more diversified customer and product base, which we believe provides **_a sound basis for business expansion going forward_**."

**August 7, 2013 Earnings Call**

9

**Statement 29**

"**[T]here is opportunity at Apple, at Facebook and at these hyperscale accounts** as we had an established footprint because when their databases are growing, when their data footprint is growing, we actually are able to sell product and sort of a maintenance on a quarterly basis."

**August 28, 2013 Form 10-K**

**Statement 30**

Defendants Robison and Wolf's signed certifications on Fusion's fiscal year 2013. Plaintiffs allege the Form 10-K was false and misleading because it failed to disclose, pursuant to Item 303 of Regulation S-K, that Fusion "was facing increasing competition due, among other things, to the commoditization of flash memory, which put downward pressure on prices and gross margins, which jeopardized the Company's performance and prospects."

**October 10, 2013 Annual Report**

**Statement 31**

The annual report contained a copy of Fusion's 10-K for fiscal year 2013, which Plaintiffs allege was false and misleading for the reasons stated above.

Plaintiffs allege that the above statements or omissions were misleading for one of two reasons. First, Plaintiffs contend that statements or omissions regarding Fusion's financial situation and outlook were false or misleading because the Individual Defendants failed to disclose that Fusion was facing rising competition due in part to the increased commoditization of flash memory, which in turn put pressure on Fusion's prices and jeopardized Fusion's revenue and future prospects. *See, e.g.*, *id.* ¶ 38. Second, with respect to comments concerning Facebook and Apple, Plaintiffs allege that these statements or omissions were false or misleading because the Individual Defendants knew and/or recklessly disregarded the fact that Fusion faced increasing competition for its Apple and Facebook accounts, and as a result business from these companies was no longer assured. *See, e.g.*, *id.* ¶¶ 49, 55. Plaintiffs also contend that the Individual Defendants misrepresented the decision of Facebook and Apple to not purchase additional Fusion products as a "two-quarter shift in timing" when in fact there was a risk that both of these customers would reduce overall demand for flash memory products manufactured by Fusion. *See, e.g.*, *id.* ¶ 49.

According to the Complaint, during the course of the Class Period Fusion's stock price fell from a high of $26.50 per share on October 25, 2012, to close at $9.82 per share on October 24, 2013, the day after the Class Period. *Id.* ¶ 89. According to Plaintiffs, this drop in price was caused

10

1    by Fusion's eventual disclosure on October 23, 2013, the last day of the class period, that Fusion

2    faced increased competition due in part to the commoditization of flash memory products, which

3    put downward pressure on Fusion's product prices, and the fact that Fusion revoked all of its prior

4    guidance for fiscal year 2014. *See id*. ¶¶ 79-89.

5          **B.**     **Procedural Background**

6         On November 1, 2013, Plaintiffs filed their first complaint in this action. ECF No. 1. On

7    June 10, 2014, this Court issued an order appointing lead plaintiff and lead counsel. ECF No. 53.

8    On August 6, 2014, Plaintiffs filed their Consolidated Class Action Complaint, asserting that

9    Defendants violated §§ 10(b) and 20(a)-(b) of the Securities and Exchange Act of 1934. Compl.

10   ¶¶ 125-43. Plaintiffs seek to represent a class of those who purchased or acquired shares of Fusion

11   common stock during the Class Period in the United States or a U.S.-based stock exchange, and

12   who were damaged by the decline in market value Plaintiffs allege was attendant to the Individual

13   Defendants' false or misleading statements and omissions. *Id*. ¶ 118.

14        On September 22, 2014, Defendants filed the instant motion to dismiss. ECF No. 58.

15   Defendants also filed a request for judicial notice. ECF No. 58-1. Plaintiffs filed their opposition to

16   the motion on November 7, 2014. ECF No. 59. Defendants filed a reply on December 8, 2014.

17   ECF No. 60.

18   **II.**     **LEGAL STANDARD**

19       **A.**     **Federal Rules of Civil Procedure 8 and 12(b)(6)**

20        Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include a

21   "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ.

22   P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule

23   of Civil Procedure 12(b)(6). Dismissal under Rule 12(b)(6) may be based on either (1) the "lack of

24   a cognizable legal theory," or (2) "the absence of sufficient facts alleged under a cognizable legal

25   theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). In considering

26   whether the complaint is sufficient to state a claim, the court accepts as true all of the factual

27   allegations contained in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). However, the

28   court need not "accept as true allegations that contradict matters properly subject to judicial notice

**United States District Court**
For the Northern District of California

11

or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks omitted). While a complaint need not allege detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 677 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B.   Federal Rule of Civil Procedure 9(b) and the PSLRA

Because Plaintiffs have brought securities fraud claims under the PSLRA, Rules 8 and 12(b)(6) are not the only governing legal standards. Plaintiffs must also satisfy the heightened pleading standards set forth by Rule 9(b) of the Federal Rules of Civil Procedure and by the PSLRA itself. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). In addition, the PSLRA requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter." *Zucco Partners*, 552 F.3d at 990. With respect to falsity, the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). To the extent an allegation is based on information and belief, "the complaint shall state with particularity all facts on which that belief is formed." *Id.* "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008)

With respect to scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). That is, plaintiffs must plead with particularity the facts evidencing "the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). To satisfy the

12

United States District Court
For the Northern District of California

rigorous pleading standards of the PSLRA, the complaint's scienter allegations must give rise not simply to a plausible inference of scienter, but rather to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. at 314.

### C.    Leave to Amend

If the Court determines that the complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "should be freely granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and alterations omitted). When dismissing a complaint for failure to state a claim, "'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Id*. at 1130 (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (internal quotation marks omitted)). Accordingly, leave to amend is denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III.    DISCUSSION

### A.    Request for Judicial Notice

In connection with their motion to dismiss, Defendants ask this Court to take judicial notice of twenty documents, including excerpts of eight reports filed with the SEC and four quarterly earnings calls. *See* Defendants' Request for Judicial Notice, ECF No. 58-1 ("RJN"), Exs. A-B, O-T (reports); L-N (transcripts). "Although generally the scope of review on a motion to dismiss for failure to state a claim is limited to the Complaint, a court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks and citations omitted). The court may "treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under

13

Rule 12(b)(6).'" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

Here, Plaintiffs' Complaint refers to and quotes from the contents of Defendants' quarterly earnings calls that occurred on October 24, 2012, January 30, 2013, April 24, 2013, and August 7, 2013. Compl. ¶¶ 37, 45-48, 61, 77. Moreover, Plaintiffs do not dispute the authenticity of these documents. Therefore judicial notice of Exhibits K-N is appropriate. In addition, the Complaint refers to and quotes the contents of Fusion's Form 8-K filed on August 9, 2012; Form 8-K filed on October 24, 2012; Form 10-Q filed on November 7, 2012; Form 8-K filed on January 30, 2013; Form 8-K filed on April 24, 2013; Form 8-K filed on August 7, 2013; and Form 10-K filed on August 28, 2013. *Id.* ¶¶ 23, 36, 40, 42, 59, 75, 85. Again, Plaintiffs do not dispute the authenticity of these documents. Accordingly, judicial notice of Exhibits B, J, and O-S is appropriate. The Court otherwise denies Defendants' request for judicial notice at this time, as the remaining documents of which Defendants request judicial notice are either not referenced in the Complaint, or are not necessary to the resolution of Defendants' motion.

### B.    Defendants' Motion to Dismiss

In their motion to dismiss, Defendants challenge the sufficiency of Plaintiffs' § 10b claim as to (1) misrepresentation and (2) scienter. With regards to misrepresentation, Defendants argue that Plaintiffs' claim fails on multiple levels. First, Defendants argue that Plaintiffs fail to allege specific, contemporaneous facts inconsistent with any of the Individual Defendants' statements at issue, and therefore Plaintiffs fail to plead the statements' falsity as required by the PSLRA. Mot. at 6. Second, Defendants argue that the allegedly omitted information—that Fusion was facing increasing competition due in part to the commoditization of flash memory—was discussed in Fusion's risk disclosures, as well as in contemporaneous analyst reports before and during the Class Period, and that accordingly the Individual Defendants made no actionable misrepresentations as to the state and prospects of the company. Mot. at 7-9. Third, Defendants argue that many of the challenged statements are forward-looking statements accompanied by appropriate cautionary language, and therefore are protected by the PSLRA's "Safe Harbor" Provision. Mot. at 13-16. Fourth, Defendants assert that many of the challenged statements

14

1    (including some which Defendants also claim are forward-looking) are not actionable because they

2    are mere expressions of corporate optimism. Mot. at 17.

3          Defendants also contend that Plaintiffs fail to plead sufficient facts establishing the requisite

4    inference of scienter. Defendants argue that Plaintiffs neglect to provide adequate direct or

5    circumstantial evidence of scienter on the part of any of the Individual Defendants, including that

6    the Individual Defendants knew of any contradictory information at the time they made any of their

7    challenged statements, or that the Individual Defendants had a motive to commit fraud or make

8    misrepresentations. Mot. at 19-23. Defendants also challenge Plaintiffs' claim that scienter can be

9    inferred based on a "core operations" theory. *Id.* Finally, because Defendants argue that Plaintiffs'

10   § 10b claim fails, Plaintiffs' claims under §§ 20(a) and (b) fail as well. Mot. at 24.

11         As discussed in detail below, the Court grants Defendants' motion to dismiss Plaintiffs'

12   § 10b claim because Defendants' statements are either (1) forward-looking statements

13   accompanied by meaningful cautionary language, and therefore are immunized under the PSLRA's

14   Safe Harbor Provision; (2) not actionable as statements of corporate optimism; or (3) because

15   Plaintiffs fail to allege with sufficient factual particularity that the statements were false when

16   made. Therefore, the Court need not address Defendants' numerous arguments in the alternative

17   regarding dismissal.[1]

18                        **1.      Forward-Looking Statements**

19         Under the PSLRA "Safe Harbor" Provision, "forward-looking statements" are not

20   actionable as a matter of law if they are identified as such and accompanied by "meaningful

21   cautionary statements identifying important facts that could cause actual results to differ materially

22   from those in the forward looking statement." *See* 15 U.S.C. § 78u–5(c)(1)(A)(i). A forward-

23   looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of

24   management for future operations, (3) future economic performance, or (4) the assumptions

25   'underlying or related to' any of these issues." *No. 84 Employer-Teamster Joint Council Pension*

26

27   ─────────────────────
     [1] Although Defendants have challenged all disputed statements on multiple grounds, the Court
28   grants the motion to dismiss as to each statement on one ground, and need not address the other
     grounds for dismissal. However, Plaintiffs must cure all deficiencies identified in Defendants'
     motion to dismiss in any amended complaint, or face dismissal with prejudice.

Case No.: 13-CV-05368-LHK
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

1    *Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u5

2    (i)). "[I]f a forward-looking statement is identified as such and accompanied by meaningful

3    cautionary statements, then the state of mind of the individual making the statement is irrelevant,

4    and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera*

5    *Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010). Alternatively, if a forward-looking statement is

6    not identified as such or is unaccompanied by meaningful cautionary statements, then the statement

7    is actionable only if the plaintiff proves that the forward-looking statement "was made with actual

8    knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B).

9         Here, Defendants argue that many of the challenged statements which were made during

10   earnings calls or in press releases accompanying Fusion's earnings announcements were forward-

11   looking and accompanied by meaningful cautionary language, and are therefore protected by the

12   PSLRA's Safe Harbor. Before addressing the statements at issue, the Court finds it useful to

13   discuss one of Plaintiffs' arguments in rebuttal. In their opposition, Plaintiffs argue that some of the

14   statements Defendants contend are forward-looking are still actionable because, even if they did

15   contain forward-looking statements, they also contained "'statements of past or present facts'" and

16   therefore "'are not covered by the safe harbor provisions.'" Opp'n at 15 (quoting *Mulligan v.*

17   *Impax Labs, Inc.*, No. C-13-1566 EMC, 2014 U.S. Dist. LEXIS 54346, at *54-58 (N.D. Cal. Apr.

18   18, 2014)). In other words, Plaintiffs argue that if forward-looking statements also contain

19   "representations of current fact," then the PSLRA Safe Harbor offers no protection. Opp'n at 16.

20   The Ninth Circuit recently confronted a similar argument in *Police Retirement System of St. Louis*

21   *v. Intuitive Surgical, Inc.*, in which the plaintiffs argued that in the case of statements which mixed

22   non-forward-looking statements with forward-looking ones, the former were still actionable. 759

23   F.3d 1051, 1059 (9th Cir. 2014). The *Intuitive Surgical* court stated it "need not resolve whether

24   the safe harbor covers non-forward-looking portions of forward-looking statements because,

25   *examined as a whole, the challenged statements related to future expectations and performance*."

26   *Id.* (citing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)) (emphasis added). Based

27   on this, the Ninth Circuit held two arguably mixed statements to be protected by the PSLRA Safe

28   Harbor. First, when asked about lower capital expenditures by hospitals, one of the individual

16

1  defendants in *Intuitive Surgical*—an executive at a manufacturer of robotic surgical devices—

2  stated: "At the present time, we don't have any indicators that tell us that's the case. But we're

3  early into this." *Id.* at 1059. (internal quotation marks omitted). The Ninth Circuit held that,

4  examined as a whole, the statement is "properly classified as an assumption 'underlying or related

5  to' projections for lower hospital expenditures on Systems." *Id.* (citing *No. 84 Emp'r-Teamster*,

6  320 F.3d at 936). Second, when asked if anything in the "external environment" made the

7  executives nervous about purchases in the next twelve months, another individual defendant

8  responded: "[T]here's always a decision within a hospital of how do they prioritize their capital

9  investment . . . I think we come up typically fairly high on that priority list. . . . We aren't hear[ing]

10  anything that causes us any significant concern . . . no change from last quarter, I guess. . . ." The

11  Ninth Circuit held that "[i]n context, this statement is properly understood as regarding [the

12  individual defendant's] expectations of the future impact of the external economic environment on

13  Intuitive" and therefore was immunized under the PSLRA Safe Harbor. *Id.* Accordingly, to the

14  extent that any of the statements at issue in the instant lawsuit contain both forward-looking and

15  non-forward-looking statements, the Court examines them as a whole to determine whether they

16  relate to future expectations and performance.

17         The Court finds that Statements 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 29 are forward-

18  looking statements within the meaning of the PSLRA Safe Harbor. At least four of these

19  statements—Statements 9, 11, 13, and 14—were made on January 30, 2013 at the conclusion of

20  Fusion's fiscal second quarter, and explicitly relate to Fusion's guidance for future revenue in the

21  company's upcoming fiscal quarter, or the assumptions underlying Fusion's guidance for its future

22  revenue. *See* Statement 9 ("There is a lot of potential for these key customers, and *the change in*

23  *our guidance reflects a two-quarter shift in the timing of their bulk purchases*.") (emphasis added);

24  Statement 11 ("The *change in our guidance* is the result of a shift in the timing of bulk purchases

25  from our two key accounts, specifically for the next two quarters.") (emphasis added); Statement

26  13 ("Now turning to *guidance*, we expect our core enterprise business to continue to grow in

27  excess of 50% for the full year. Our *change in guidance* is, as we have said, a result of a shift in the

28  timing of bulk purchase, and so therefore, for the fiscal third quarter of 2013, we expect revenue to

17

be approximately $80 million.") (emphasis added); Statement 14 (stating in relation to "guidance" that "the strategic accounts are a two-quarter shift," "[i]t's just a shift in what we expect the demand to be there," and "nothing has really changed.") (emphasis added). Where, as here, company representatives make statements regarding a company's "guidance" for future revenue, those "statements are forward-looking, and protected by the PSLRA Safe Harbor." *In re ESS Tech., Inc. Sec. Litig.*, No. C-02-04497 RMW, 2004 WL 3030058, at *9 (N.D. Cal. Dec. 1, 2004); *see also In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1079-80 (N.D. Cal. 2010) (statements regarding, *inter alia*, a company's "financial guidance . . . easily meet the definition of a forward-looking statement"); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1133 (S.D. Cal. 2012) (statements regarding "revenue guidance" are "certainly forward-looking"); *In re Cutera*, 610 F.3d at 1111 (earnings projection is "by definition" forward-looking).

Several others of the challenged statements explicitly refer to Fusion's "opportunity" or "opportunities" for future operations, or the assumptions underlying those opportunities for future operations, and therefore qualify as forward-looking statements. *See* 15 U.S.C. § 78u–5(c)(1)(A)(i) (forward-looking statements include statements regarding "plans and objectives of management for future operations"). The first half of Statement 7 ("We continue to believe we have a *compelling opportunity in this market environment*") is a statement relating to Fusion's "opportunity," i.e. prospects, in the future, and the second half of that statement ("given that our products generate a significant return on investment for our customers") is the assumption underlying those prospects. Similarly, Statement 10 ("We are well-positioned to *capture opportunities*") also regards Fusion's "opportunities," or prospects, in the future, with the remainder of that statement (discussing "a growing number of customers" moving to "new memory architectures") supplying the underlying basis for those prospects. Statement 29 regards Fusion's belief that "there is *opportunity* at Apple, at Facebook and at these hyperscale accounts," again referring to Fusion's future prospects with these customers, as well as the underlying assumption buttressing these claimed opportunities. *See* Statement 29 (discussing Fusion's "established footprint" with Apple, Facebook, and other hyperscale accounts, which allows Fusion to "sell product and sort of maintenance on a quarterly basis."). Indeed, the forward-looking nature of Statement 29 becomes more apparent when taking

18

United States District Court
For the Northern District of California

1   into account that it was made in response to an analyst question about whether Fusion is aware of

2   "any changes at Facebook or Apple from a competitive dynamic that may impact your *long-term*

3   *opportunities there*?" RJN Ex. N, at 10 (emphasis added). Furthermore, although these statements

4   arguably contain both forward-looking and non-forward-looking statements, when viewed as a

5   whole, they discuss Fusion's opportunity for growth *in the future* and the reasons Fusion believes

6   those opportunities *will exist*. Accordingly, the Court agrees with Defendants that they are forward-

7   looking. *See Intuitive Surgical*, 759 F.3 at 1059 (statement qualifies as forward-looking if

8   "examined as a whole, the challenged statements related to future expectations and performance.").

9           The remainder of the statements at issue are also, when viewed in context, forward-looking.

10   Statement 12, as quoted in the Complaint, is lengthy, but Plaintiffs challenge as false or misleading

11   two portions of it. First, Plaintiffs challenge the statement that certain of Fusion's customers

12   (implicitly Apple and Facebook) have made a "shift in their near term demand." Compl. ¶ 45.

13   However, this statement immediately precedes the statement that Fusion's "guidance reflects a

14   cautious outlook in the balance between these two conflicting forces"—which, as discussed in the

15   foregoing paragraph, are the increasing efficiency of Fusion's products, and the ability of Fusion's

16   customers to leverage Fusion's products for use in new applications, services, and data tiers. *See id.*

17   Accordingly, this statement is made in the context of Fusion's guidance for its third-quarter

18   revenues, and is therefore a forward looking statement. *See, e.g.*, *In re Bare Escentuals*, 745 F.

19   Supp. 2d at 1079-80 (N.D. Cal. 2010) (statements regarding a company's "financial guidance . . .

20   easily meet the definition of a forward-looking statement"). Second, Plaintiffs challenge the portion

21   of Statement 12 in which Individual Defendant Flynn stated that Fusion's "key accounts" are

22   "simultaneously managing their bottom line." *Id.* In context, Flynn made this statement to explain

23   "lumpy buying patterns" from Fusion's key accounts, which Flynn offered as one of the reasons for

24   Fusion reducing its financial guidance for the future fiscal quarter. *See* RJN Ex. L, at 3 (Defendant

25   Flynn's statement that the "lumpy buying patterns" over the "next 2 quarters" are one reason

26   behind Fusion's "change in our guidance."). Therefore, this statement is also properly understood

27   as being forward-looking.

28

19

Case No.: 13-CV-05368-LHK
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

1   Likewise, Statement 15, when viewed in context, relates to the assumptions underlying

2   Fusion's change in financial guidance for the future fiscal quarter. As Plaintiffs note in the

3   Complaint, Statement 15 was made in response to a question from an analyst about why Fusion

4   had "confidence and visibility that, that business, that Facebook and Apple *will come back . . . ?*"

5   *Id.* ¶ 47 (emphasis added). Accordingly, Statement 15 ("It's the question of when their

6   deployments happen. So this is really about the timing . . .") is made in response to a question

7   about what assumptions Fusion had with respect to what *will* happen in the future with respect to

8   Fusion's revenue from the company's key accounts. Moreover, the remainder of Statement 15

9   illustrates that Flynn made the statement in the context of Fusion changing its financial guidance

10  for the upcoming fiscal quarter. *See* RJN Ex. L, at 4 ("So it's still—it still is up to them on when

11  they deploy these things. *But we provide guidance based on the best that we see.*") (emphasis

12  added).

13  Statement 16, which discusses whether there is any risk attendant in Fusion's Apple and

14  Facebook accounts, was similarly made in response to an analyst question about Fusion's

15  assessment of the risk of competition *in the future* and Fusion's assumptions as to how that risk

16  would impact the company's future revenues. *See id.* (analyst question regarding whether there is

17  "any risk that those customers are taking a step back and rethinking their architecture and maybe

18  considering or inviting new competitors in to bid for their next round of business?"). Therefore,

19  Statement 16 also relates to Fusion's assumptions underlying its future economic performance and

20  qualifies as forward-looking. *See* 15 U.S.C. § 78u5(i) (forward-looking statements include any

21  statement regarding "future economic performance" and the assumptions underlying those).

22  Finally, Statement 17 was similarly made in response to an analyst question about "the

23  various proof points you are going to be looking for *over the next, let's say, 3 months*" that certain

24  customers "*will* come back and start materially spending and buying." RJN Ex. N, at 6 (emphasis

25  added). In response to the question, Flynn stated that "as we've worked with these customers, it's

26  rather ironic that the efficiencies attained through leveraging their own products is what allows

27  them to . . . extend the timeframe, for which they need to put in more equipment." *See* Compl. ¶ 48.

28  Flynn went on to say that "we're very confident that the uniqueness of our product, and more

20

United States District Court
For the Northern District of California

1    importantly the relationship with these customers, means that *when they decide* to do their next step

2    function in building new data centers or moving to new apps, that it *will* be with Fusion-io." *Id.*

3    (emphasis added). Although Flynn arguably does not offer a very responsive answer, in context it

4    is clear that Flynn made the statement in response to a question about his assumptions underlying

5    Fusion's guidance "over the next . . . 3 months." RJN Ex. N, at 6

6        Finally, all of the above statements were accompanied by "meaningful cautionary

7    statements" as required by the PSLRA Safe Harbor Provision. *In re Cutera*, 610 F.3d at 1112.

8    Statements 7, 11, 12, 13, 14, 15, 16, 17, and 29 were made during quarterly earnings calls.

9    According to transcripts of these calls, Fusion began each call with the nearly identical statement

10   that some statements made during the call would constitute forward-looking statements within the

11   meaning of the federal securities laws. RJN Ex. K, at 2 (cautionary statement at beginning of

12   October 24, 2012 earnings call); RJN Ex. L, at 2 (same, at beginning of January 30, 2013 earnings

13   call); RJN Ex. M, at 2 (same, at beginning of April 24, 2013 earnings call); RJN Ex. N, at 2 (same,

14   at beginning of August 7, 2013 earnings call). These statements further cautioned listeners that

15   forward-looking statements were predictions based on current expectations and assumptions, that

16   these expectations and assumptions involved risks and uncertainties, and referred listeners to

17   Fusion's registration statements and reports filed with the SEC. *See, e.g.*, RJN Ex. K, at 2. These

18   cautionary statements are virtually identical to language approved by the Ninth Circuit in instances

19   in which forward-looking statements were immunized by the PSLRA Safe Harbor. *See, e.g.*,

20   *Intuitive Surgical*, 759 F.3d at 1059-60 (approving cautionary language in earnings call warning

21   that comments may contain forward-looking statements, that such statements may differ based on

22   "certain risks and uncertainties," and referring listeners to "the company's [SEC] filings"); *In re*

23   *Cutera*, 610 F.3d at 1112 (approving cautionary language at beginning of earnings call that remarks

24   contained forward-looking statements "concerning future financial performance and guidance,"

25   and that "Cutera's ability to continue increasing sales performance worldwide could cause variance

26   in the results.") (internal quotation marks omitted).

27       Statements 9 and 10 were made in Fusion's January 30, 2013 press release which

28   accompanied Fusion's quarterly earnings announcement and Fusion's financial guidance for the

Case No.: 13-CV-05368-LHK
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

1    future fiscal quarter. This press release contained a lengthy "Note on Forward-looking Statements"

2    which warned that certain statements in the release may constitute forward-looking statements

3    within the meaning of Section 21E of the Securities Exchange Act of 1934 and Section 27A of the

4    Securities Act of 1933. RJN Ex. P, at 9. The release went on to say that such statements included

5    "statements concerning financial guidance," "the expected benefits and value of our products and

6    solutions," "our position to capture market share," "our expectations regarding market trends," and

7    "our beliefs concerning the timing of bulk purchases of our products by customers." *Id*. The

8    statement explicitly warns readers to "not rely upon forward-looking statements as predictions of

9    future events," and refers readers to Fusion's registration statements and reports on file with the

10   SEC. *Id*. This language is substantially similar to the statements which accompanied Fusion's

11   phone calls with analysts, which as this Court already noted are sufficient under Ninth Circuit

12   precedent to receive protection from the PSLRA Safe Harbor. *See, e.g.*, *Intuitive Surgical*, 759 F.3d

13   at 1059-60. Accordingly, the cautionary language that accompanied Statements 9 and 10 likewise

14   is sufficient under the PSLRA.

15            Plaintiffs, in their opposition, argue that the statutory safe harbor should not apply to

16   Defendants' oral forward-looking statements because the cautionary language which preceded

17   those statements did not comply with the letter of the PSLRA. Opp'n at 17-18. Specifically,

18   Plaintiffs argue that the PSLRA requires that forward-looking statements be (1) accompanied by

19   cautionary statement that the "'*particular oral statement is* [a] *forward-looking* [statement]'" and

20   (2) that additional cautionary information is "'contained in a readily available written document, or

21   portion thereof'" and that "'*identifies the document, or portion thereof*.'" Opp'n at 17-18 (quoting

22   15 U.S.C. § 78u-5(c)(2) (emphasis in original). Accordingly, Plaintiffs argue that because

23   particular oral statements were not accompanied by cautionary language, and the cautionary

24   language did not identify the specific document, or portion thereof, where additional cautionary

25   language could be found, Defendants did not comply with the requirements of the statutory safe

26   harbor. Opp'n at 17. However, Plaintiffs cite no authority for their argument that each and every

27   forward-looking statement must be accompanied by cautionary language, or that documents

28   containing additional cautionary language must be cited with specificity. Moreover, as previously

22

discussed, Defendants' cautionary statements conform with language already approved by the Ninth Circuit. *See, e.g.*, *Intuitive Surgical*, 759 F.3d at 1059-60; *In re Cutera*, 610 F.3d at 1112.

Plaintiffs also argue that the PSLRA safe harbor does not apply because Plaintiffs "plead facts sufficient to show Defendants' actual knowledge" of falsity. Opp'n at 18. However, "if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant." *In re Cutera*, 610 F.3d at 1112. Accordingly, even assuming Plaintiffs pled sufficient facts to show the Individual Defendants knew their forward-looking statements were false, this would be irrelevant where, as here, the statements are identified as forward-looking and accompanied by meaningful cautionary language. *See id.*

For the foregoing reasons, the Court finds that Statements 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 29 are forward-looking statements accompanied by meaningful cautionary language. Therefore, the Court grants Defendants' motion to dismiss as to these statements because these statements are protected by the PSLRA Safe Harbor.

### 2.   General Statements of Corporate Optimism

In the Ninth Circuit, "vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws" because no reasonable investor would rely on such statements. *In re Impac Mortg. Holdings, Inc.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003)); *In re Cutera*, 610 F.3d at 1111 ("[P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives."). This is because "[w]hen valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera,* 610 F.3d at 1111; *see also In re iPass, Inc. Sec. Litig.*, No. C 05-00228 MHP, 2006 WL 496046, at *4 (N.D. Cal. Feb. 28, 2006) (generalized statements of optimism are not actionable because they are "'not capable of objective verification,'" and "'lack[ ] a standard against which a reasonable investor could expect them to be pegged.'") (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).

United States District Court
For the Northern District of California

1    Thus, for example, a court has held not actionable as "mere puffery" statements that "[w]e

2  are very pleased with the learning from our pilot launch," "so far we're getting really great

3  feedback," and "we are very pleased with our progress to date." *Wozniak v. Align Tech., Inc.*, No.

4  C 09–3671 MMC, 2012 WL 368366, at *4-5 (N.D. Cal. Feb. 3, 2012). Likewise, "statements

5  projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to

6  30% growth rate over the next several years'" have been held not actionable as mere puffery. *In re*

7  *Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005); *see*

8  *also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868-89 (N.D. Cal. 2004) ("run-of-the-

9  mill" statements such as "business remained 'strong'" are not actionable under § 10(b)); *In re*

10  *LeapFrog Enter., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007) (vague statements

11  such as "This is going to be a very big second half for us," "Our underlying sell-through at the

12  retail level remained very strong throughout the third quarter," "consumer demand for our learning

13  products is more vibrant than ever," and "We are pleased with our progress" were not actionable

14  under § 10(b)); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064

15  (N.D. Cal. 2012) (statements that "[b]oth Verizon and AT&T are strong partners," company has

16  "strong demand metrics and good momentum" and "our demand indicators are strong, our product

17  portfolio is robust" are unactionable statements of corporate optimism).

18    Here, Defendants argue that many of the statements at issue are general statements of

19  corporate optimism. The Court agrees with Defendants that Statements 1, 3, 4, 6, 22, 23, 24, 26,

20  27, and 28 fall within this category of unactionable statements, as these are all general and vague

21  remarks of corporate optimism. *See* Statement 1 ("[W]e are *pleased with the momentum we have*

22  *going into the next fiscal year . . .*") (emphasis added); Statement 3 ("The combination of our go[-

23  ]to-market strengths and our expanding product portfolio is *just now beginning to pay off.*")

24  (emphasis added); Statement 4 ("[W]e *made excellent progress this year* on our product road map,

25  go-to-market strategy and market share capture . . .") (emphasis added); Statement 6 ("We *are*

26  *pleased with our execution in the first quarter* and our ability to continue to capture market share")

27  (emphasis added); Statement 22 ("*We are pleased by our traction this quarter*, driven by strength

28  in our core business as well as our healthy pipeline of new hyperscale customers.") (emphasis

24

added); Statement 23 ("Our ioScale product is showing *notable traction . . .*") (emphasis added);

Statement 24 ("Our relationship with Facebook and Apple *is strong . . . . They are a key—we are a*

*key* part of their infrastructure and expect to grow as they grow.") (emphasis added); Statement 26

(remarking that Fusion is "a successful public company. . . . [T]here's not a problem with the

company."); Statement 27 ("[W]e are *well positioned to capture a significant share of the*

*opportunity* from enterprise to hyperscale over the next few years.") (emphasis added); Statement

28 ("We exited fiscal 2013 with a significantly more diversified customer and product base, which

*we believe provides a sound basis for business expansion going forward.*") (emphasis added).

These "vague statements of optimism" and other "feel good monikers" are not actionable

statements. *Intuitive Surgical, Inc.*, 759 F.3d at 1060. Indeed, most if not all of them echo

statements that other courts in this Circuit, including this Court, have previously found to be

unactionable statements of mere puffery. *See, e.g.*, *Wozniak*, 2012 WL 368366, at *4-5 ("[w]e are

*very pleased* with the learning from our pilot launch" and "progress to date" were not actionable)

(emphasis added); *Royal Oak*, 880 F. Supp. 2d at 1064 (statements that company has "*strong*

*demand metrics* and *good momentum,*" that other companies were "*strong partners,*" and "our

demand indicators are *strong*, our product portfolio is *robust*" were not actionable as statements of

mere corporate optimism) (emphasis added).

In their opposition, Plaintiffs argue that Individual Defendants' statements are not mere

puffery because they "successfully deceived the market." Opp'n at 13. However, Plaintiffs do not

explain why or how any of the statements enumerated above, except for Statement 24, successfully

deceived the market. *See id.* In addition, Plaintiffs have not otherwise shown why the generalized

statements detailed above would fall outside the category of "vague statements of optimism" that

the Ninth Circuit has held to be inactionable. *In re Cutera*, 610 F.3d at 1111.

With respect to Statement 24, Plaintiffs argue that this statement by Individual Defendant

Wolf ("Our relationship with Facebook and Apple is strong . . . . They are a key—we are a key part

of their infrastructure and expect to grow as they grow.") is not mere puffery because "Fusion's

two strategic accounts provided 44% of Fiscal 2013 revenues." Opp'n at 14. Therefore, according

to Plaintiffs, Wolf's general assertion about the state of Fusion's relationship with these customers

Case No.: 13-CV-05368-LHK
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

1    was "manifestly significant." *Id.*; *see also* Opp'n at 15 ("Here, there is no question Fusion's

2    financial success depended on Apple and Facebook.") However, generalized statements of

3    corporate optimism are not actionable even where those statements concern a company's

4    relationships with important customers. *See Royal Oak*, 880 F. Supp. 2d at 1064 (finding statement

5    that "Both Verizon and AT&T are *strong partners* . . ." was a vague assertion of corporate

6    optimism) (emphasis added). Moreover, in general a corporate officer's use of "terms like 'strong'

7    and 'spectacular' are not actionable under the securities laws." *In re Yahoo! Inc. Sec. Litig.*, No. C

8    11-02732 CRB, 2012 WL 3282819, at *17 (N.D. Cal. Aug. 10, 2012) (internal quotation marks

9    omitted); *In re Copper Mountain Sec. Litig.,* 311 F.Supp.2d at 868-69 (words like "strong" and

10   "very positive" are not actionable because, for among other reasons, "they are considered

11   immaterial and discounted by the market" and "reasonable investors do not consider 'soft'

12   statements or loose predictions important in making investment decisions") (internal quotation

13   marks omitted).

14       Plaintiffs also argue that Statement 24 cannot be mere puffery because it was "made

15   without a reasonable basis." Opp'n at 14. In support of this, Plaintiffs cite to *Warshaw v. Xoma*

16   *Corp.*, which Plaintiffs contend is "instructive." *Id.* at 14-15 (citing *Warshaw v. Xoma Corp.*, 74

17   F.3d 955 (9th Cir. 1996). In *Warshaw*, the Ninth Circuit held that the statement "everything [was]

18   going fine" was actionable, and that "[s]uch general statements of optimism, when taken in

19   context, may form a basis for a securities fraud claim . . ." Opp'n at 15 (quoting *Warshaw*, 74 F.3d

20   at 959-60)). As the Ninth Circuit subsequently described in *In re Syntex Corporation Securities*

21   *Litigation*, what made the statement in *Washaw* actionable is that the plaintiff there "pled facts

22   showing that the statements were false when made." 95 F.3d 922, 931 (9th Cir. 1996); *see also*

23   *Intuitive Surgical*, 759 F.3d at 1060 (general statement in *Warshaw* actionable because the

24   defendant made the statement that regulator approval of its product was "imminent" when the

25   defendant "knew that it was not."). In that context, it is an "uncontroversial proposition" that such

26   statements can form the basis of a securities fraud claim. *Intuitive Surgical*, 759 F.3d at 1060. Here,

27   as discussed in Section III.B.4, *infra*, Plaintiffs have not sufficiently pled falsity with respect to

28

26

1    Statement 24. Therefore, *Warshaw* does not salvage Plaintiffs' cause of action with respect to

2    Statement 24.

3         For the foregoing reasons, the Court finds that Statements 1, 3, 4, 6, 22, 23, 24, 26, 27, and

4    28 as currently alleged are general statements of corporate optimism. Therefore, the Court grants

5    Defendants' motion to dismiss as to these statements.

6                  **3.    Allegations Based on Alleged Violations of Item 303**

7         In their Complaint, Plaintiffs allege that five of the challenged statements—Statements 8,

8    18, 25, 30 and 31—violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303. Item 303 of

9    Regulation S-K requires that a company disclose "known trends or uncertainties that have had or

10   that the registrant reasonably expects will have a material favorable or unfavorable impact on net

11   sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Plaintiffs

12   allege that the five statements at issue, which are the signed certifications of Individual Defendants

13   on Fusion's quarterly and annual reports, were false or misleading because the quarterly and annual

14   reports failed to disclose that Fusion "was facing increasing competition due, among other things,

15   to the commoditization of flash memory, which put downward pressure on prices and, in turn, on

16   the Company's sales and gross margin," even though "SEC regulation [Item 303] required" such

17   disclosure. *See, e.g.* Compl. ¶ 40, 93-97. Plaintiffs thus use Defendants' alleged violations of Item

18   303 to form the basis of Plaintiffs' claims as to Statements 8, 18, 25, 30, and 31. *See id.*

19        In the Ninth Circuit, "[i]t is well established that violation of an exchange rule will not

20   support a [Section 10(b) or Rule 10b-5] claim." *In re Verifone Sec. Litig.*, 11 F.3d 865, 870 (9th

21   Cir. 1993). This includes alleged violations of Item 303. *Id.* Thus, even if Defendants had a duty

22   under Item 303 to disclose then-existing known trends in Fusion's quarterly and annual reports,

23   their failure to do so cannot form a basis for Plaintiffs' § 10(b) claim. Accordingly, Plaintiffs'

24   claims as to Statements 8, 18, 25, 30, and 31 are not actionable as they are currently pled. Thus, the

25   Court grants Defendants' motion to dismiss as to these statements.

26                        **4.    Failure to Sufficiently Allege Falsity**

27        To assert a claim under the PSLRA, the plaintiff must plead with particularity, *inter alia*,

28   the element of falsity. *Zucco Partners*, 552 F.3d at 990-91. "The PSLRA has exacting requirements

United States District Court
For the Northern District of California

27

for pleading 'falsity.'" *Metzler*, 540 F.3d at 1070. To satisfy these "exacting requirements," a plaintiff must plead "specific facts indicating why" the statements at issue were false. *Id.*; *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Plaintiffs' complaint was required to allege specific facts that show" how statements were false); *see also In re Stratosphere Corp. Sec. Litig.*, No. CV-S-96-708-PMP, 1997 WL 581032, at *13 (D. Nev. May 20, 1997) (to plead falsity, plaintiff must provide "evidentiary facts contemporary to the alleged false or misleading statements from which this court can make inferences permissible under Rule 9(b)."). Moreover, to be actionable, a statement must be false "at [the] time by the people who made them." *Larkin*, 253 F.3d at 430. "The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re VeriFone Sec. Litig.*, 11 F.3d at 871.

Here, there are only five statements remaining which this Court has not already found to be inactionable: Statements 2, 5, 19, 20, and 21. Statements 2 and 5 are remarks made by Individual Defendants Wolf and Flynn, respectively, regarding Fusion's current financial state and prospects.[2] Plaintiffs allege that these remarks were false or misleading because, using virtually identical language that appears throughout Plaintiffs' Complaint, neither statement disclosed the existence of "increasing competition due, among other things, to the commoditization of flash memory, [which] put downward pressure on prices . . . [and] jeopardized the Company's financial performance and prospects." Compl. ¶¶ 29, 34. Statements 19, 20, and 21 are public remarks made by Wolf and Flynn that, in substance, Fusion projected Apple and Facebook postponed purchases of Fusion products by approximately two quarters. Plaintiffs contend that these statements were false or misleading because, in addition to not disclosing the existence of "increasing competition," "Defendants had no basis to believe Fusion's customers, particularly Facebook and Apple, would purchase Fusion products when they chose to upgrade or expand their datacenters or build new applications." Compl. ¶¶ 55-58.

---

[2] Defendants also move to dismiss Statement 2, a comment made by Wolf during Fusion's August 9, 2012 quarterly earnings call, on the grounds that it was protected by the PSLRA Safe Harbor. Mot. at 14, n.11. However, Defendants did not attach a copy of the transcript from this earnings call to Defendants' request for judicial notice. Therefore, the Court cannot determine at this time whether Statement 2 was accompanied by meaningful cautionary language and falls within the scope of the PSLRA Safe Harbor.

Case No.: 13-CV-05368-LHK
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

Plaintiffs' claims regarding the falsity of these statements are not legally sufficient, for several reasons. First, Plaintiffs allege that all five of these statements—and indeed, every statement at issue in their Complaint—was false or misleading because the statements failed to disclose the existence of "increasing competition due, among other things, to the commoditization of flash memory, [which] put downward pressure on prices . . . [and] jeopardized the Company's financial performance and prospects." *Id*. ¶ 29 (allegations pertaining to Statement 2); *see also id*. ¶ 34 (alleging Statement 5 was false and misleading because it "failed to disclose that the Company already was facing increasing competition due, among other things, to the commoditization of flash memory, which put downward pressure on prices and, in turn, on the Company's sales and gross margin, which jeopardized the Company's financial performance."); *id*. ¶ 58 (alleging that Statements 19, 20, and 21 were false or misleading because they failed to disclose that "the Company already was facing increasing competition due, among other things, to the commoditization of flash memory, which put downward pressure on prices and gross margins, which jeopardized the Company's financial performance and prospects.").

However, to the extent that Plaintiffs fault Wolf and Flynn "for not providing a more fulsome report" with respect to the Company's financial prospects, it is well-settled that "[t]he securities laws do not demand such reporting." *Intuitive Surgical*, 759 F.3d at 1061. In *Intuitive Surgical*, for instance, plaintiffs alleged that a series of statements were false or misleading because the defendant did not "detail[] that system placement was declining because of market saturation and the economic downturn, that new Systems were being purchased at higher utilization rates, and that [product] growth was declining faster than anticipated." *Id*. The Ninth Circuit held that such allegations were not false or misleading because "Rule 10b-5 prohibits '*only* misleading and untrue statements, not statements that are incomplete.'" *Id*. (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis in original). Here, similar to *Intuitive Surgical*, Plaintiffs allege that all the statements at issue were false or misleading because they provided an incomplete picture of Fusion's financial outlook. Specifically, Plaintiffs allege that the statements of Wolf and Flynn were incomplete because the statements failed to disclose the existence of certain trends in the flash memory industry. *See, e.g.*, Compl. ¶ 58 (alleging Wolf and Flynn failed

29

United States District Court
For the Northern District of California

1    to disclose the "commoditization of flash memory" and the decline in "prices and gross margins").

2    Yet to "survive a motion to dismiss under the heightened pleading standards of the [PSLRA], the

3    plaintiffs' complaint must specify the reason or reasons why the statements made by [the

4    defendant] were misleading or untrue, not simply why the statements were incomplete." *Brody*,

5    280 F.3d at 1006. Thus, even accepting Plaintiffs' allegation that the statements at issue were

6    incomplete, it does not follow that these statements were false.

7         Second, Plaintiffs' claims as to these statements fail because Plaintiffs do not plead

8    "specific facts indicating why" these statements were false when made. *Metzler*, 540 F.3d at 1070.

9    Plaintiffs base their allegations of falsity primarily on two facts: (1) on January 30, 2013, Fusion

10   revised its guidance for fiscal year 2013 from a previous projection of between 45 to 50 percent

11   growth in revenue, to between 17 to 22 percent growth, Compl. ¶ 43; and (2) on August 7, 2013,

12   Robison stated in an earnings call that, among other things, "opportunities," including ones at

13   Facebook and Apple, "that we would otherwise have available to us . . . are not there, because we

14   are too expensive," Compl. ¶ 79 (internal quotation marks omitted). In other words, Plaintiffs

15   allege that because subsequent facts allegedly undermined the statements of Wolf and Flynn during

16   the Class Period, those statements were false. *See* Opp'n at 6 (arguing that because Fusion made a

17   "dramatic" reduction in guidance on January 30, 2013, and that on August 7, 2013 Robison

18   "admitted Fusion had *lost* business 'because we were too expensive' and the 'big driver' with

19   Apple and Facebook . . . 'was price,'" the Complaint "details exactly why [each challenged

20   statement] was deceptive.") (emphasis in original). However, as the Ninth Circuit has held, it is

21   "clearly insufficient for plaintiffs to say that [a] later, sobering revelation[ ] make[s] [an] earlier,

22   cheerier statement a falsehood." *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999)

23   (alterations in original). Moreover, it is similarly well-settled in the Ninth Circuit that "fraud by

24   hindsight is not actionable." *Larkin*, 253 F.3d at 430 n.12 (internal quotation marks omitted). That

25   Wolf and Flynn made statements which, in retrospect, may have been wrong or optimistic, are not

26   facts "that would support an inference that the company's more optimistic [statements] were

27   known to be false or misleading at the that time by the people who made them." *Larkin*, 253 F.3d

28   at 430; *see also In re VeriFone*, 11 F.3d at 871 ("The fact that [a] prediction proves to be wrong in

**United States District Court**
For the Northern District of California

1    hindsight does not render the statement untrue when made."). Therefore, even assuming that

2    Statements 2, 5, 19, 20, and 21 ultimately proved to be wrong or were undermined by subsequent

3    events, this alone is not an adequate basis upon which "this court can make inferences [of falsity]

4    permissible under Rule 9(b)." *In re Stratosphere Corp. Sec. Litig.*, 1997 WL 581032, at *13.

5           Third, to the extent that Plaintiffs rely on the accounts of Confidential Witnesses ("CW") to

6    support Plaintiffs' allegations regarding falsity, the accounts of the CWs are insufficient. To

7    support their claim of falsity, Plaintiff's principally rely on the CW identified in the Complaint as

8    "CW1." *See id.* at 7; Compl. ¶ 41. CW1 is a "former strategic account manager at Fusion" who was

9    "responsible for developing certain relationships and contracts." Compl. ¶ 41. CW1 was employed

10   at Fusion from November 2011 to December 2012. *Id.* According to the Complaint, in mid-

11   November 2012, CW1 met with his supervisor, the "Senior Vice President, Americas Sales," who

12   in turn reported directly to James Dawson, Fusion's Chief Sales Officer. *Id.* At that meeting, the

13   senior vice president told CW1 "in substance" that CW1 and other employees would have to be

14   "cut" because "the Company was not going to make its projected revenues and was eliminating

15   jobs to enhance profitability." *Id.*

16          There are two principal problems with CW1's account. First, CW1's account of Fusion

17   missing its projected revenues relies on hearsay from Fusion's "Senior Vice President, Americas

18   Sales." *Id.* Where, as here, a confidential witness relies on hearsay, courts accord the account of

19   that witness little weight. *See Zucco Partners*, 552 F.3d at 996 (finding confidential witnesses'

20   accounts could not support securities fraud claim where, *inter alia*, "many report only unreliable

21   hearsay"). Second, CW1's account is not contemporaneous with any of Statements 2, 5, 19, 20, or

22   21. Statements 2 and 5 were made on August 9, 2013 and September 25, 2012, at least two to three

23   months before CW1 attended his alleged meeting with the senior vice president. *See* Compl. ¶ 41.

24   Similarly, Statements 19, 20, and 21 were all made in mid to late February, at least three months

25   after the meeting in CW1's account. *See id.* Therefore, CW1's alleged account about Fusion not

26   meeting its sales goals is not a contemporaneous fact which suggests the falsity of Statements 2, 5,

27   19, 20, or 21. *See In re Stratosphere Corp.*, 1997 WL 581032, at *13 (to adequately plead falsity,

28   plaintiff must "provide . . . evidentiary facts *contemporary to* the alleged false or misleading

31

statements") (emphasis added); *Larkin*, 253 F.3d at 430 (to be actionable, a statement must be false "at [the] time by the people who made them.").[3]

With respect to Statements 19, 20, and 21—which are public remarks made by Wolf and Flynn that Fusion projected Apple and Facebook postponed purchases of Fusion products by approximately two quarters—Plaintiffs appear to also rely on the accounts of two other confidential witnesses, identified as CW2 and CW7, to allege these statements' falsity. CW2, a former account executive for "the Western Region, which covered Facebook and Apple," worked at Fusion from March 2012 to March 2013. Compl. ¶ 103. CW2 stated that Fusion faced "significant competition" from companies such as Intel, Virident Systems, and Violin Memory. *Id.* According to CW2, each region held quarterly business reviews attended by sales personnel. *Id*. In addition, until October 2012, Fusion's Chief Sales Officer led a "regular 8 a.m. Monday conference call" during which "all the U.S. sales people reported on the status of their accounts." *Id*. The sales people would discuss, among other things, "any pressure from a competitor and the size of the potential sale in jeopardy." *Id*. According to CW2, the Chief Sales Officer reported to Flynn. *Id*.

CW7, a former account executive who worked at Fusion from July 2009 to June 2013, said that certain statements by the Individual Defendants that sales were delayed because Fusion's products performed better than expected and therefore did not need to be replaced as often was "bogus" because "everyone knew the products would not need to be replaced in three or four years." *Id.* ¶ 108. Although Plaintiffs do not link CW7's account with the falsity of any particular statements, Statements 19 and 20 allude to Fusion's customers, in particular Facebook and Apple, finding that Fusion's products had unexpected longevity. *See* Statement 19 ("We had anticipated them to refresh the data center and to put in new application area. But instead, they realized they didn't—they don't—the data centers they have, this 4-year old one, doesn't need to be refreshed

---

[3] Plaintiffs appear to rely on CW1's account to support Plaintiffs' allegation that Wolf falsely stated on October 24, 2012 that Fusion's guidance remained "unchanged." *See* Compl. ¶ 41 (alleging that at the time CW1 was told Fusion would not meet its revenue projections, Fusion's guidance "remained 'unchanged.'"). However, according to Plaintiffs, CW1 was told that Fusion would not meet its projected revenues "in mid November 2012." *Id.* ¶ 41. Therefore, the statement about Fusion failing to meet its projected revenues is not contemporaneous with Wolf's October 24, 2012 statement regarding guidance, and therefore is not a factual allegation that supports the implication that Wolf's statement was false at the time Wolf made it. *See Larkin*, 253 F.3d at 430.

Case No.: 13-CV-05368-LHK
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

and they reused product to start seeding their new application . . ."); Statement 20 ("It just happens to use for the first couple of pods our 4-year old product from the data center that got decommissioned, displacing and putting a revenue pocket because of the use of that . . . And it proves the point that our product is – has a second life and is valuable.").

The accounts of CW2 and CW7 do not provide sufficient factual support for Plaintiffs' allegations of falsity as to Statements 19, 20, and 21. With respect to CW2, CW2's account does not mention Fusion's business with Apple or Facebook. Indeed, Plaintiffs do not allege that CW2 worked on the Apple or Facebook accounts, or that CW2 recalls or can recount any discussions about these accounts, or even that Fusion faced competition for the Apple and Facebook accounts. Rather, CW2 merely states that Fusion salespeople attended meetings where they discussed general topics such as "pressure from a competitor" and the "size of the potential sale in jeopardy." *Id.* ¶ 103. Where a plaintiff relies on the accounts of confidential witnesses, the Court must evaluate the witness' account based on, *inter alia*, "the level of detail provided by the confidential sources." *Zucco Partners*, 552 F.3d at 995. Here, CW2's statements are too general to support the implication that statements regarding the buying patterns of Apple and Facebook were false. With respect to CW7, CW7's statement that remarks regarding the unexpected longevity of Fusion's products were "bogus" is a vague and conclusory allegation which is insufficient to support Plaintiffs' claim of falsity. *Zucco Partners*, 552 F.3d at 998 (where "confidential witnesses report only conclusory assertions," those assertions are inadequate to support a claim of securities fraud).[4]

---

[4] For similar reasons, Plaintiffs have not sufficiently alleged the falsity of Statement 24. As previously discussed, *see* Section III.B.2, *supra*, Statement 24 is an inactionable statement of corporate optimism, or mere puffery. However, the Court also discusses whether Plaintiffs sufficiently allege falsity as to Statement 24 because Plaintiffs claim that Statement 24 was "made without a reasonable basis." Opp'n at 14. Statement 24 is a remark by Flynn that Fusion's "relationship with Facebook and Apple is strong. Their orders this quarter are in line with our expectations." As discussed with respect to Statements 19, 20, and 21, Plaintiffs have not alleged sufficient facts from which the Court can imply that statements regarding Apple and Facebook's future buying patterns were false when made. *See Larkin*, 253 F.3d at 430 (to be actionable, a statement must be false "at [the] time by the people who made them.") CW2 is the only confidential witness who mentions Fusion's business with Apple and Facebook. *See* Compl. ¶ 103. Yet CW2 does not allege that he had personal knowledge of the Apple and Facebook accounts, that those accounts were in jeopardy, or that Fusion faced competition for those accounts. In short, CW2's statement does not support Plaintiffs' allegation that Flynn made Statement 24 "without a reasonable basis."

33

United States District Court
For the Northern District of California

1    The remaining confidential witnesses speak generally about the fact that Fusion faced

2  "competition" or about the witness's awareness of the trend of commoditization in the flash

3  industry. *See* Compl. ¶ 104 (CW3, a former system engineer who worked at Fusion from July 2008

4  to October 2013, stating that in late 2012, Fusion faced "a lot of competition" and that some time in

5  2012, Fusion lost a big deal to a competitor); *id.* ¶ 105 (CW4, a global account manager with

6  responsibility for Hewlett-Packard and who worked at Fusion from January 2012 to September

7  2013, relating that Fusion "faced competition from much cheaper products sold by Virident and

8  Intel," that Violin Memory "also was a competitor"); *id.* ¶ 106 (CW5, a former director of product

9  marketing involved with customer support from January 2012 to March 2013, saying he "believed

10  the reason Apple sales dropped so much" was because of the "price of flash," and that as flash

11  memory became more widely available, "the price dropped substantially"); *id.* ¶ 107 (CW6, a

12  former executive in Fusion's Advanced Products Group who worked at Fusion from December

13  2011 to February 2013, stating that "Apple sales fell so much because of competition," and that the

14  "industry was changing fast, there was lots of competition, and prices were dropping"); *id.* ¶ 109

15  (CW8, a former financial analyst at Fusion from June 2012 to November 2013 who reported to the

16  company's director of product marketing, stating that "everyone in marketing was aware of

17  competitive pressure."). Plaintiffs appear to rely on these accounts to support Plaintiffs' allegation

18  that the challenged statements were incomplete because they failed to disclose "increasing

19  competition" faced by Fusion, as well as the "commoditization of flash memory" and the effect it

20  was having on Fusion's "prices . . . financial performance and prospects." *Id.* ¶ 29. However, as

21  previously discussed, a plaintiff does not state a claim of falsity under the PSLRA by simply

22  alleging that a statement was "incomplete." *Brody*, 280 F.3d at 1006; *Intuitive Surgical*, 759 F.3d at

23  1061. Therefore, the accounts of these CWs do not support Plaintiffs' allegation of falsity.

24    For the reasons stated above, the Court finds that, with respect to Statements 2, 5, 19, 20,

25  and 21, Plaintiffs' fail to plead falsity as required by the PSLRA. Therefore, the Court GRANTS

26  Defendants' motion to dismiss as to these statements.[5]

27

28  _____

[5]

Case No.: 13-CV-05368-LHK
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

*United States District Court*
For the Northern District of California

### 5.     Plaintiffs' Claims Under §§ 20(a) and (b)

Plaintiffs also bring claims against Defendants for violations of §§ 20(a) and (b) of the

Exchange Act. Section 20(a) imposes joint and several liability on those who control any person

who is otherwise liable under the Exchange Act. *See* 15 U.S. Code § 78t(a). Plaintiffs allege that

Individual Defendants Flynn, Robison, and Wolf are "controlling persons" within the meaning of

§ 20(a), and therefore liable based on Plaintiffs' claimed violation of § 10b. Compl. ¶ 139. Section

20(b) imposes liability on anyone who, directly or indirectly, does any act or thing that would

otherwise be unlawful under the Exchange Act. *See id.* § 78t(b). Plaintiffs allege that the Individual

Defendants engaged in conduct that was unlawful under § 10(b) and the rules and regulations

promulgated thereunder. Compl. ¶ 141. Accordingly, Plaintiffs' claims under §§ 20(a) and (b) are

wholly reliant on the viability of Plaintiffs' claim under § 10(b). Because the Court determines that

Plaintiff's claim under § 10(b) fails, Plaintiffs' claims under § 20(a) and (b) fail as well. Therefore,

Defendants motion to dismiss these claims is granted.[6]

### C.     Leave to Amend

As previously discussed, when dismissing a complaint for failure to state a claim, a court

should grant leave to amend "unless it determines that the pleading could not possibly be cured by

the allegation of other facts." *Lopez*, 203 F.3d at 1127. Here, although the Court has determined

that Plaintiffs fail to state a claim, it is possible Plaintiffs can cure their allegations by alleging,

*inter alia*, more particular facts as to why statements by the Individual Defendants were false when

---

[6] Defendants also move to dismiss Plaintiffs' claims under § 10b on the grounds that Plaintiffs fail
to plead a strong inference of scienter. The Court has already found that Plaintiffs' claim under
§ 10b is not actionable, and therefore need not address the substance of the parties' arguments as to
the sufficiency of the alleged scienter. However, to the extent that Plaintiffs may seek to allege a
theory of "collective scienter" in any amended complaint, the Court notes that the Ninth Circuit in
*In re NVIDIA* stated that a theory of collective scienter "might be appropriate" where "'a
company's public statements were so important and so dramatically false that they would create a
strong inference that at least *some* corporate officials knew of the falsity upon publication.'" *In re
NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (emphasis in original) (quoting
*Glazer Capital Mgmt., L.P. v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008)). As an example, the
Ninth Circuit cited the Seventh Circuit's hypothetical where "'General Motors announced that it
had sold one million SUVs in 2006, and the actual number was zero.'" *Glazer*, 549 F.3d at 743
(quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). Although
the Court expresses no view as to whether Plaintiffs here can allege a theory of collective scienter,
Plaintiffs are hereby on notice that, in the Ninth Circuit, "[i]n most cases, the most straightforward
way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual
defendant." *Glazer*, 549 F.3d at 743 (internal quotation marks omitted).

35

Case No.: 13-CV-05368-LHK
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

made. Accordingly, because Plaintiffs may salvage their Complaint, the Court finds amendment would not be futile. Plaintiffs' claims are therefore dismissed with leave to amend.

## IV.        CONCLUSION

Defendants' motion to dismiss Plaintiffs' Complaint in its entirety is GRANTED with leave to amend. Should Plaintiffs choose to file an amended complaint, they must do so within 30 days of this Order. Failure to do so, or failure to cure the deficiencies addressed in this Order, will result in dismissal of Plaintiffs' claims with prejudice. Plaintiffs may not add new claims or parties without leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.

**IT IS SO ORDERED.**

Dated: February 12, 2015

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

Case No.: 13-CV-05368-LHK
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND